RENDERED: APRIL 29, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0227-MR

LP PRESTONSBURG RIVERVIEW,
LLC D/B/A RIVERVIEW HEALTH
CARE CENTER; LP O HOLDINGS,
LLC; SIGNATURE HEALTHCARE
CLINICAL CONSULTING
SERVICES, LLC; SIGNATURE
HEALTHCARE CONSULTING
SERVICES, LLC; MISSY ALLEN,
ADMINISTRATOR; JENNIFER
MOORE, APRN; KIM BATES;
DEBBIE HALL; VIVIAN BOYD;
KRYSTAL COLLINS; STEPHANIE
GREER; TRACY LEMASTER;
JESSICA SLONE; VHONDA
DOTSON; DEBORAH OUSLEY;
TENA BAILEY; JESSICA
HACKWORTH; HEATHER
BRUMBAUGH; AND JOYCE BITTEN                    APPELLANTS


                APPEAL FROM FLOYD CIRCUIT COURT
v.              HONORABLE JOHNNY RAY HARRIS, JUDGE
                ACTION NO. 18-CI-00490


DR. PHILLIP SIMPSON AND
CHRISTINA SIMPSON                                          APPELLEES

## OPINION
## REVERSING AND REMANDING

** ** ** ** **

BEFORE: CALDWELL, GOODWINE, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: LP Prestonsburg Riverview, LLC d/b/a Riverview Health Care Center, along with several other limited liability companies and individually named employees (collectively, "Riverview"), have appealed pursuant to Kentucky Revised Statutes (KRS) 417.220 from the January 28, 2021, order of the Floyd Circuit Court denying the motion to compel arbitration. We reverse and remand.

The underlying matter began with the filing of a complaint by Dr. Philip[1] Simpson (Simpson) and his wife, Christina Simpson (Mrs. Simpson), seeking damages for injuries Simpson incurred during his stay at Riverview, a nursing and rehabilitation facility.[2] He claims he was not given the proper care and attention during his stay, which resulted in serious personal injury as well as physical and mental pain and suffering. Mrs. Simpson's claim was for loss of consortium. They sought both compensatory and punitive damages in the prayer for relief.

---

[1] The notice of appeal incorrectly spells Simpson's first name as Phillip.

[2] The Simpsons also named Highlands Regional Medical Center, Chad Patterson, MD, and Larry Leslie, MD, as defendants in their complaint. These defendants are not involved in the present appeal.

In lieu of an answer, Riverview filed a motion to compel arbitration and stay the Simpsons' action pursuant to 9 United States Code (USC) § 2 *et seq.* and KRS 417.060(1). Riverview stated that Simpson was a resident of the facility on two occasions. On both of these occasions, he signed an "Agreement to Informally Resolve and Arbitrate All Disputes" contract (the arbitration agreements), dated July 3 and July 27, 2017. Each provided, in relevant part, as follows:

> RESIDENT, FACILITY, AND ANY OTHER PERSON SIGNING THIS DOCUMENT UNDERSTAND AND AGREE THAT:
>
> 1. If a dispute or legal claim of any kind (including a class or representative action or claim) arises between the parties signing this agreement (collectively a "dispute"):
>
>    - We will first try and resolve the dispute informally between ourselves.
>
>    - If we do not succeed, we will mediate the dispute.
>
>    - If mediation is not successful, we will arbitrate the dispute.
>
> 2. The arbitrator will be a neutral person who will decide our dispute, and who we agree:
>
>    - Can award either one of us the same damages as a court could.
>
>    - Will apply Kentucky law and Rules of Civil Procedure and Rules of Evidence.

- Will decide all questions about this agreement, including but not limited [to] whether the person(s) signing it has proper authority and whether it is enforceable.

- His/her decision(s) will be **FINAL**.

  **THIS MEANS THAT NO ONE WILL FILE A LAWSUIT AGAINST THE OTHER, AND THAT EACH PARTY IS GIVING UP, OR WAIVING, THE RIGHT TO FILE A LAWSUIT AND HAVE A JUDGE OR A JURY DECIDE THE DISPUTE AND/OR ANY ISSUES ABOUT THIS AGREEMENT**. This also means we agree to completely avoid the court system and that we do not want a judge or jury deciding any part of our dispute. We can still talk about our dispute, however, with any federal or state agency, outside the court system.

3. The mediation and/or arbitration will take place in **KENTUCKY**, in the county where the Facility is located. We can have an attorney represent each of us.

4. This agreement involves interstate commerce, and the Federal Arbitration Act and the Kentucky Uniform Arbitration Act will govern and control it, and any related arbitration proceeding. If there is any material, substantive conflict or inconsistency between these two Acts, the Federal Arbitration Act will control.

5. To start the informal dispute, mediation, or arbitration process, one of us must:

- Send a request in writing to the other (via certified mail, return receipt) and include a detailed account of the dispute, a proposed resolution, and what

process is being requested (informal, mediation, or arbitration).

- If informal resolution is requested, the parties will schedule a mutually convenient time to discuss the dispute and possible resolution(s).

- If mediation or arbitration is requested, the parties will discuss and agree upon the person who will mediate or arbitrate the dispute, and when mediation or arbitration occur. We agree that the arbitrator will be an independent, disinterested, and qualified attorney with at least 7 years' experience in nursing home care. If we cannot agree on an arbitrator, then each of us will nominate our own arbitrator candidate, and together, the candidates will agree upon and select another independent, disinterested, and qualified attorney with at least 7 years' experience in nursing home care.

6. This agreement will bind any person or entity that is later appointed to act on my/our behalf. It will also remain valid and in effect if one of us later becomes disabled or incompetent. We agree it will be upheld and enforced against our heirs, beneficiaries, estates, estate representatives, successors, statutory wrongful death beneficiaries, and assigns.

7. This agreement will also remain valid, and of full force and effect, even if the Resident is discharged and then later re-admitted to the Facility. It will also apply to all of the Resident's subsequent admissions and stays.

8. We represent to each other that we have the proper authority to sign this agreement, and we each rely upon the other's representation.

9.  If any part of this agreement is found invalid or unenforceable, we agree that all remaining parts of it will remain in full force and effect.

10.  ***We understand and agree that either one of us can revoke or cancel this agreement by, and only by, providing written notice to the other within thirty (30) days of the date we sign this document***.

[Section to be completed if the resident was not signing the document himself is omitted.]

## SIGN HERE!

**I HAVE READ THIS DOCUMENT, UNDERSTAND IT, HAVE HAD THE CHANCE TO ASK QUESTIONS, AND ACKNOWLEDGE MY RIGHT TO SPEAK WITH AN ATTORNEY ABOUT THIS. I UNDERSTAND THIS AGREEMENT IS REQUIRED FOR ADMISSION TO THE FACILITY.  I VOLUNTARILY CONSENT TO ALL OF ITS TERMS AND CONDITIONS.  I HAVE RECEIVED A COPY OF IT, OR UNDERSTAND AND AGREE THAT THE FACILITY WILL PROVIDE A COPY TO ME UPON MY REQUEST**.

The July 3, 2017, agreement contains the initials "PS" on the date line, and it was signed by facility representative Stephanie Greer and witnessed by Jocelyn Bolin. The July 27, 2017, agreement contains Simpson's signature on the Resident's Signature line and was again signed by facility representative Ms. Greer.

Riverview stated that Simpson filed the complaint with the court as well as with the Medical Review Panel Branch of the Cabinet for Health and Family Services without initiating mediation or arbitration as required by the

arbitration agreements. By proffering the arbitration agreements, Riverview met its burden of establishing the existence of such an agreement. Therefore, it requested that the court enforce the arbitration agreements, compel arbitration of Simpson's claims, and stay (or dismiss) the action pending arbitration.

In his response, Simpson stated that he did not remember signing an arbitration agreement and that even if his initials were on the first agreement, he had not been given the opportunity to read and understand the contract in relation to the arbitration agreement. He also argued that the arbitration agreement was unconscionable. He included an affidavit with his response in which he stated that he would never have knowingly signed an arbitration agreement. He stated in his affidavit:

1) I do not remember signing any documents during either of my stays at the Defendant's nursing home facility. If I would have signed a document, I would not have marked an "X," nor would have I initialed my name. I would have signed a signature similar to the one on this Affidavit.

2) Even if I did sign any documents, I was never given a chance to read or understand any documents. I have bad vision, and use a magnifying glass to read, so even if I did sign something, I would have no idea what it would have been at the time.

3) During my first stay at the nursing home, I had been transferred from the hospital to the nursing home for care, and was taken directly back to a hospital room. I do not recall being asked to sign papers before being taken back to the room.

4) During one of my stays, although I do not recall which one, a lady, whose name I also do not recall, brought in some paperwork. When I asked what the papers were, she said it was "just some admission papers." She did not explain to me what the content of the paperwork was when I directly asked her. Since I cannot see well without a magnifying glass, I did not know what these papers were. I also do not remember if I even signed these papers at that time as both of my times being admitted to the nursing home were during stressful times.

5) I would never have knowingly signed an arbitration agreement. I am somewhat familiar with the effect of an arbitration agreement, so I would never have knowingly signed away my rights.

In its reply, Riverview pointed out that Simpson never denied that he had signed the arbitration agreements. Riverview also argued that Simpson was equitably estopped from attempting to avoid his obligations under the arbitration agreements. In support, Riverview included the affidavits of Riverview employee Stephanie Greer, who had worked as a social worker there for 14 years, and Riverview Office Manager Jocelyn Bolin, who were both present when Simpson signed the first arbitration agreement. Ms. Greer was also present when he signed the second arbitration agreement upon his readmission. In her affidavit, Ms. Greer stated that the arbitration agreement had been explained to Simpson each time it was presented to him. She brought Ms. Bolin in to witness Simpson's signature for the July 3, 2017, agreement "as he advised he would only sign with his

initials." She said that "Dr. Simpson clearly understood what he was signing that day" and recalls Dr. Simpson making comments that "he was only signing the Arbitration Agreement because it 'had loopholes' and that the agreement 'didn't mean anything.'" In her affidavit, Ms. Bolin stated that she witnessed Simpson sign the July 3 arbitration agreement with his initials, PS, and that "Mr. Simpson clearly understood what he was signing that day" and even commented that he was only signing the Arbitration Agreement "because there were ways around [it.]"

Riverview argued that Simpson had failed to meet his burden to rebut the presumption that the arbitration agreements were valid or to establish that the agreements were unconscionable. Riverview specifically pointed out that both parties were waiving their right to file a lawsuit, that any arbitration would take place in Kentucky, and that either party could revoke the agreement by written notice within thirty days.

By order entered March 6, 2019, the court denied the motion to compel as it was not ripe for a ruling. The court stated that, based upon the affidavits filed, further discovery was required. Riverview moved the court to reconsider this ruling as it may require it to engage in litigation conduct that would imperil its right to arbitrate the claim. The court granted the motion and set aside the prior ruling. Instead, the court held the motion to compel arbitration in

abeyance and permitted the parties to conduct limited discovery on the issue of the arbitrability of Simpson's claims.

Simpson was deposed on January 15, 2020. He testified that he was a retired chiropractor. When he was initially admitted to Riverview, he had not been diagnosed with any kind of cognitive deficit, nor did he have any issues with cognitive functioning. He did state that there had been confusion and stress related to his five-day hospital stay before his admission. He had not been diagnosed with dementia or Alzheimer's disease, nor any condition that would affect his ability to recall information. He was also not on any medication that would affect his ability to understand any questions the attorney might ask him. Simpson testified that he had been treated since 2014 for proliferative diabetic retinopathy in both eyes, which caused him to need a magnifying glass to read.

Simpson went on to testify about his first admission to Riverview in July 2017. He recalled women bringing in documents for him to sign, including an arbitration agreement, but he did not recall signing them. He did not have his magnifier or glasses when he was admitted on July 3. He said he was not really familiar with what an arbitration agreement was, and the women did not offer to read the document to him when he told them he could not see it. Simpson stated that he thought an arbitration agreement "seemed like a weakening of my rights" and that he would not have signed such a document if he had known it was an

arbitration agreement. He denied placing his initials on the July 3 arbitration agreement and did not believe the initials were in his handwriting.

Regarding the July 27 arbitration agreement, which included a signature on the signature line, Simpson stated that "what I'm signing to is totally unclear to me" and that "it could have been in the stack with lots of other things[,]" but that "I don't recall signing it[.]" He did not deny that his signature was on the July 27 arbitration agreement; he only claimed that he did not recall signing it. During the deposition, Simpson reviewed other documents from his July 3 admission to Riverview that included his initials. He did not recall using his initials to execute any of these documents. He could not tell whether the initials were in his handwriting and later denied that the handwriting was his. He also denied telling any employees at Riverview that he understood what an arbitration agreement was and that he knew how to get out of one or that he knew there were loopholes.

Riverview filed a supplemental reply to Simpson's response to the motion to compel arbitration on December 2, 2020, which included a copy of Simpson's deposition and supplemental affidavits from Ms. Greer and Ms. Bolin. While Simpson had noticed depositions for Ms. Greer and Ms. Bolin, they were never taken.

In her supplemental affidavit, Ms. Greer stated that Simpson had been wearing his glasses when he was presented with the July 3 arbitration agreement, that she personally went through the arbitration agreement with him, that she did not refuse to read that document to him, and that when she asked if he had any questions, Simpson said he did not and added that "there were 'loopholes.'" She brought in Ms. Bolin as a witness when Simpson told her he would only sign with his initials; he said he was using his initials because he was tired. Ms. Greer placed the "X" on the signature line so that Simpson would know where to sign. He did not mention that he had been diagnosed with proliferative diabetic retinopathy, and she described him as cooperative during the admission process. Ms. Greer said that Simpson "clearly understood what he was signing that day" and recalled him commenting that he was only signing the arbitration agreement "because it 'had loopholes' and that the agreement 'didn't mean anything.'" She said that Simpson called her to be readmitted on July 27 and that he did not appear to be confused or in any distress at that time. She again explained the nature of the arbitration agreement to him, and she had an independent recollection of Simpson signing his name that day.

In her supplemental affidavit, Ms. Bolin stated that she had been in his room when Simpson was presented with the July 3 arbitration agreement, that the agreement was explained to him, and that she witnessed him using his initials,

-12-

"PS," to sign it. She said that he had used his initials because he was tired. Simpson never said that he did not understand what he was signing, and he did not ask anyone to read it to him. She stated that Simpson "clearly understood" what he was signing, and she recalled that he said, "that there were 'ways around the arbitration agreement.'"

Based upon this evidence, Riverview asserted that Simpson should be bound by the arbitration agreements. He did not deny that his signature was on the July 27 agreement; he merely stated that he did not recall signing it. And as to the July 3 agreement, Riverview argued that it had submitted evidence that Simpson had used his initials for other admission documents, that he had reviewed the agreement with a Riverview representative, and that he had executed the agreement in the presence of two representatives. Riverview again argued that Simpson was equitably estopped from avoiding his obligations under the agreements based upon his statements that there were ways around the arbitration agreement. And it again argued that the agreement was not unconscionable.

In his response, Simpson again denied that he had signed the arbitration agreements. He also pointed out differences in the initials in the different documents. And he continued to deny that he had been given the opportunity to read, understand, or ask questions about the arbitration agreement based upon his eyesight limitations. Finally, Simpson asserted that he attempted to

resolve his claim against Riverview by first submitting a settlement package setting

forth his claims, injuries, medical treatment, and associated bills, and then by

reaching out to Riverview to mediate.  Mediation was set but subsequently

canceled by Riverview.  He concluded,

> [I]ndividuals and families are pressured into signing
> boiler-plate, all-encompassing arbitration agreements
> without having any idea what rights they are giving up.
> Patients are not given any information as to what they are
> actually giving up, and are only told what the nursing
> home representatives and employees choose to tell them.
> The contract in the instant case has a clause which
> purports to allow the patient of a right to "speak with an
> attorney" prior to signing the agreement.  However, this
> practice is not feasible.  Nursing homes hold all of the
> power in these situations, and they unfairly take
> advantage of desperate people in need of care – and if
> patients do exercise their rights according to the
> agreement, they are denied care and admission into the
> nursing home facility.

On January 29, 2021, the circuit court entered an order denying

Riverview's motion to compel.  The court recognized that "[a]s indicated from the

testimony of the parties there appears to be a factual dispute as to whether or not

Dr. Simpson executed the arbitration agreement, or in the alternative, understood

what he was signing due to his failing eyesight."  The court found:

> It is without dispute that Mr. Simpson did not
> possess his magnifying glass or his additional visual aids
> which would have allowed him to properly read the
> arbitration agreement in question.  The Court takes note
> that Phillip Simpson may be an educated man, as put
> forth by the defense, however, it is apparent he did not

have the tools necessary to properly read and review the documents in question. An arbitration agreement waives the constitutional right to a jury trial by the Plaintiff in this case. The waiver of a constitutional right must be examined closely and under scrutiny. There appears to be a dispute in the testimony of the parties. What is undisputed is Mr. Simpson did not possess the tools necessary to allow him to examine the document. The Court notes some of the signatures appear to be crooked and initials appear to be in the improper line as in the July 3 agreement.

Based on the finding that Simpson had not had the opportunity to properly review and understand the arbitration agreement, the court denied the motion to compel arbitration. This appeal now follows.

In KRS Chapter 417, the General Assembly codified Kentucky's Uniform Arbitration Act (KUAA). KRS 417.050 states, in relevant part: "A written agreement to submit any existing controversy to arbitration or a provision in written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon such grounds as exist at law for the revocation of any contract." KRS 417.060(1), in turn, provides:

> On application of a party showing an agreement described in KRS 417.050, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration. If the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised. The court shall order arbitration if found for the moving party; otherwise, the application shall be denied.

-15-

"[T]he party seeking to enforce an agreement has the burden of establishing its existence, but once prima facie evidence of the agreement has been presented, the burden shifts to the party seeking to avoid the agreement.  The party seeking to avoid the arbitration agreement has a heavy burden."  *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 857 (Ky. 2004) (citing *Valley Constr. Co., Inc., v. Perry Host Management Co., Inc.*, 796 S.W.2d 365, 368 (Ky. App. 1990)).

KRS 417.220(1)(a) permits an appeal from an order denying a motion to compel arbitration and provides in (2) that the appeal "shall be taken in the manner and to the same extent as from orders or judgments in a civil action."

> [O]ur review of a trial court's ruling in a KRS 417.060
> proceeding is according to usual appellate standards.
> That is, we defer to the trial court's factual findings,
> upsetting them only if clearly erroneous or if unsupported
> by substantial evidence, but we review without deference
> the trial court's identification and application of legal
> principles.

*Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 340 (Ky. App. 2001).

Riverview first argues that it met its burden to produce valid arbitration agreements.  We agree that it "met the prima facie burden by providing copies of written and signed agreements to arbitrate."  *Louisville Peterbilt*, 132 S.W.3d at 857.  Therefore, the burden shifted to Simpson to establish that the arbitration agreements it produced were not valid.  *Id*.

-16-

The circuit court in this case denied the motion to compel solely based upon its factual finding that Simpson did not have the equipment necessary to read the agreements when they were presented to him. Riverview argues that, as a matter of law, this does not render the arbitration agreements invalid, and therefore Simpson failed to rebut the presumption of validity. Under the circumstances of this case, we agree.

First, Riverview contends that Simpson had a duty to make himself aware of the contents of the arbitration agreements. "This application was made and signed by appellant, and while he says he did not read it, he must be charged with having knowledge of what it contained. It was his duty to read it before signing it, or at least to know its contents." *Miles v. National Union Fire Ins. Co. of Pittsburg, Pa.*, 201 Ky. 179, 256 S.W. 7, 8 (1923). The former Court of Appeals later held:

> "The rule that one who signs a contract is presumed to know its contents has been applied even to contracts of illiterate persons on the ground that if such persons are unable to read, they are negligent if they fail to have the contract read to them. If a person cannot read the instrument, it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so, and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents.["] 6 R.C.L. Contracts, § 43.

*Clark v. Brewer*, 329 S.W.2d 384, 386 (Ky. 1959).

And in *Jewell v. Massillon Engine & Thresher Co.*, 198 Ky. 22, 247

S.W. 1117 (1923), the former Court of Appeals discussed the issue and concluded

that a party has a duty to procure the necessary equipment to read a contract:

> This was the only issue of fact in the case; that is,
> whether the agent of appellee company fraudulently
> omitted to read to appellant, Jewell, all the terms of the
> contract. If he did do so after appellant had requested
> him to read the contract, he was guilty of such wrong as
> would, upon seasonable application, have warranted a
> court of equity in setting aside the contract. The
> evidence of appellant, Jewell, who alone testified, shows
> very clearly that he could at the time read, but that he did
> not have his glasses with him, and that he asked the agent
> of appellee company to read the contract to him, and that
> he relied upon the agent to read the whole of the contract.
> His evidence is not entirely satisfactory upon what parts
> of the contract were read by appellee's agent to appellant.
> He is a little indefinite and not entirely sure about the
> particular parts of the contract which were read to him
> and which were omitted by the agent. He admits,
> however, that at the time of the making of the contract
> the agent of the company gave him a copy thereof, which
> he carried with him to his home. This was in February.
> It must be presumed that appellant had glasses at home
> with which he could see to read, and it was his duty,
> under the terms of the contract, to read and understand it
> within a reasonable time after returning home and after
> he had procured glasses and was able to see to read it.
> As will be noticed from the paragraph of the contract
> above copied, appellant, Jewell, had six days after the
> delivery of the tractor at his place in which to try it out
> and accept or reject it. He now says it was very defective
> and wholly worthless. Although it was purchased by him
> in February it was not delivered at his place until the 3d
> of April. During that time he should have examined his
> contract. He had no right to rely upon the reading by the

agent of the company when he had full opportunity to examine it before the tractor arrived.

*Id*. at 1117-18.

In the present case, Simpson argues that he did not have a duty to make himself aware of the contents of the arbitration agreements because he was not aware that they existed. However, while Simpson testified that no one had offered to read the arbitration agreements to him, he did not ask anyone to do so, and the testimony of Ms. Greer establishes that she went through the July 3 arbitration agreement with him and explained the July 27 agreement as well. The arbitration agreements contained 30-day revocation clauses, which would have provided Simpson with plenty of time to obtain the necessary equipment that would enable him to read the documents. We reject Simpson's position that Riverview had a duty to foresee that he required specialized medical equipment to read the arbitration agreements based upon its possession of his medical records.

In addition, our review of the record reflects that Simpson was aware of the arbitration clauses. In his supplemental response to the motion to compel, after discussing the portion of the arbitration agreement setting out the process to be followed in the event of a claim, Simpson stated:

> [I]t should be noted that Plaintiff did take steps to try to bring this action/dispute to an amicable conclusion. First, the Plaintiff submitted a settlement package to the Defendants setting out Plaintiff's claims, injuries, medical treatment and medical bills. No offer from the

> Defendant was forthcoming. Secondly, Plaintiff reached
> out to the Defendants to mediate this matter. Mediation
> was set, but subsequently cancelled by Defendants.

This admission in a court filing appears to establish that Simpson was aware of the existence of the arbitration agreements, despite his claims that he lacked knowledge of them and did not recall signing them.

Based upon the circumstances of this case, we hold that the circuit court erred as a matter of law in denying the motion to compel arbitration due to its finding that Simpson did not have the opportunity to properly review and understand the arbitration agreements.

In addition, we agree with Riverview that Simpson failed to establish that he had not signed the arbitration agreements or that the agreements were unconscionable. Thus, Simpson has failed in his burden to rebut the validity of the arbitration agreements Riverview filed.

For the foregoing reasons, we reverse the order of the Floyd Circuit Court, and this matter is remanded for the entry of an order granting Riverview's motion to compel arbitration.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

BRIEF FOR APPELLEES:

John David Dyche
Leigh V. Graves
Louisville, Kentucky

Glenn Martin Hammond
Pikeville, Kentucky